# ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
)
Highland Al Hujaz Co., Ltd. ) ASBCA No. 58243
)
Under Contract No. W917PM-09-C-0049 )

APPEARANCES FOR THE APPELLANT: Herman M. Braude, Esq.
Edward D. Manchester, Esq.
  Braude Law Group, P.C.
  Washington, DC

APPEARANCES FOR THE GOVERNMENT: Thomas H. Gourlay, Jr., Esq.
  Engineer Chief Trial Attorney
Daniel B. McConnell, Esq.
James A. Wallace, Esq.
  Engineer Trial Attorneys
  U.S. Army Engineer District, Middle East
  Winchester, VA

## OPINION BY ADMINISTRATIVE JUDGE THRASHER

This appeal arises out of a contract between the U.S. Army Corps of Engineers (Corps or government) and Highland Al Hujaz Co., Ltd. (Highland or appellant) to design and build an Afghan National Army (ANA) installation on Camp Hero in Kandahar, Afghanistan. Highland appeals from the government's decision to terminate the contract for default. Only the propriety of the Corps' default decision is before us in this appeal.[1] We have jurisdiction to adjudicate this appeal pursuant to the Contract Disputes Act, 41 U.S.C. §§ 7101-7109. Because the Corps has shown that it properly terminated the contract for default and Highland has not shown that its default was excusable, the appeal is denied.

---

[1] Post-hearing, the government asserted government claims for excess reprocurement costs, overpayments during performance, and liquidated damages under this contract. Appellant appealed all these claims and all have been set for hearing: reprocurement costs and overpayments, ASBCA Nos. 59746, 59818, 60134; and liquidated damages, ASBCA No. 60385. On 26 February 2016, the files in these associated appeals were consolidated with Highland Al Hujaz Co., Ltd., ASBCA No. 58243. However, this decision only addresses appellant's appeal of the government's termination of Contract No. W917PM-09-C-0049 for default.

# FINDINGS OF FACT

## A. Background

### 1. Solicitation and Contract Requirements

1. In February 2009, the Corps issued a solicitation for a firm-fixed-price contract for the design and construction of an ANA Corps Support Battalion (CSB) installation to be located adjacent to the ANA Garrison at Camp Hero in Kandahar, Afghanistan (R4, tab 3 at 1, 3, 60).

2. While the project required the CSB to be master planned so that it could ultimately accommodate 1,640 soldiers, the site initially would host about 700 soldiers (R4, tab 3 at 3, 60-61). Accordingly, the solicitation stated that the soldiers' barracks, the dining facility (DFAC), and several priority life-support systems were to be completed by 1 September 2009. If they were not completed by that date, the contractor would be responsible for providing temporary facilities or systems to support 700 soldiers until the permanent facilities or systems were in place. (*Id.* at 67, 70, 74, 75) The site electrical distribution system, or power system, was one such system. The solicitation stated in red lettering: "If the power system is not completed by September 01, 2009 the contractor will be required to supply temporary power to the compound" (*id.* at 67).

3. The solicitation set forth in full text local clause 2.2, "ATTACKS FROM HOSTILE ENTITIES," which stated in pertinent part:

> This contract is firm fixed-price. Costs incurred in the performance of project execution that arise from the attacks of hostile entities, such as costs arising from damage to or destruction of contractor equipment and facilities, and damage to or destruction of project prior to Government acceptance, are the sole responsibility of the contractor. The Government makes no guarantee to provide the contractor with security, and bears no obligation to reimburse the contractor for costs arising from the attacks of hostile entities. When appropriate, the Contracting Officer may provide the contractor with an equitable adjustment with respect to time – but not cost – in accordance with clause 52.249-10[.]

(R4, tab 3 at 175) The solicitation also set forth in full text an "AI Other Changes in Contract Performance" clause which stated:

2

It is recognized by the parties entering into this contract that performance of the contemplated project will take place in Afghanistan. Afghanistan has been designated by the President of the United States as an area in which Armed Forces of the United States are and have been engaged in combat. As such, circumstances may cause the contemplated project to be [a]ffected during said performance. Examples of such circumstances include but are not limited to: Outbreak of hostilities in or near the project site; changes in contemplated project site (ownership of the project); U.S. Government and Afghanistan Government policy changes; site access denials; and other unforeseeable changes in the conditions of the project site that prevent the completion of the project as originally contemplated. Such circumstances may require the contract to be terminated, relocated, redesigned, etc[.], or a combination of factors. The aforementioned possibly [sic] remedy to unforeseen circumstances is meant to be illustrative and not all inclusive. In the event the Contractor is UNABLE to perform the project *on the site set forth and described in the contract* for any of the circumstances set forth above, the Contractor shall be entitled to an equitable adjustment to the [a]ffected terms and conditions of the contract. [Italics added]

*(Id.* at 54) Similarly, the solicitation recognizes that: "Construction delays due to full or partial base closures due to incidents such as demonstrations, civil unrest and outright attacks will be examined on an individual basis for consideration of time extensions" (R4, tab 3, § 01060, special clauses ¶ 1.22.3).

4. On 26 February 2009, the Corps amended its solicitation, extending the move-in date for the barracks and priority life-support systems from 1 September 2009 to 1 January 2010 (R4, tab 4 at 1). Additionally, several "Questions and Answers" were incorporated into the solicitation by the 26 February 2009 amendment *(id.* at 6-9). One of the questions was whether a contract line item number (CLIN) would be added for CSB temporary facilities in the event the contractor was unable to have the barracks and or the priority life-support systems completed by the move-in date. The Corps' response was:

NO. The contractor should bid appropriately according to the contractor's ability to complete the permanent facilities and utilities within the required schedule. If the contractor believes he will not have the life support facilities

completed by the Soldier move-in date, then he should
include the temporary facilities cost into his bid proposal.

(*Id.* at 7) Additionally, the Corps confirmed that the number of soldiers to be supported initially would be 700 and that the battalion of ANA soldiers was expected to actually move in and occupy the barracks by the revised move-in date, 1 January 2010 (*id.* at 7).

5. On 27 March 2009, the government amended the solicitation to incorporate additional "Questions and Answers" (R4, tab 8 at 1, 5-19). Referring to the solicitation's Attacks from Hostile Entities clause (*see* finding 3), and noting the "rise of terrorist incidents and the deterioriation [sic] of security conditions throughout Afghanistan," one prospective offeror "respectfully requested" that the Attacks from Hostile Entities clause be replaced by a "War Risk" clause that shifted the risk of loss of equipment and materials resulting from such attacks to the government (*id.* at 9). The Corps declined to make such a change, insisting instead that:

> THE CONTRACTOR MUST BID UPON THIS
> PROJECT KNOWING ALL RISKS ASSOCIATED
> WITH CONSTRUCTION IN AFGHANISTAN. SUCH
> RISKS FAR EXCEED HOSTILITIES. NO SPECIAL
> CLAUSE IS TO BE ADDED; THE CONTRACTOR IS
> RESPONSIBLE FOR ALL ACTIONS, INCLUDING
> DELAYS FROM HOSTILITIES, ETC[.] AND SHOULD
> REFLECT THIS RISK IN HIS BID. THE PURPOSE OF
> THE DESIGN-BUILD CONTRACT IS TO REFLECT
> SUCH RISKS UPON THE CONTRACTOR AND NOT
> THE GOVT[.]

(*Id.* at 9-10)

6. Another question which was raised was about the CLIN under which a prospective offeror should price temporary facilities and service, to which the Corps responded that "[t]he contractor shall bid accordingly under each facility CLIN. Contractor should take into account the ability or inability of the contractor to complete the priority facility by the stated move-in date." (*Id.* at 16, question 73)

7. Highland submitted a proposal by the proposal deadline of 13 April 2009 and on 3 June 2009, the Corps awarded Contract No. W917PM-09-C-0049 (the contract) to Highland (R4, tab 11 at 1). At the time of award, the total value of the contract was $26,749,757.62 (*id.* at 2). The project was to be entirely completed within 420 days of receiving notice to proceed (*id.* at 1, 70). However, priority tasks, including the site electrical distribution system, the barracks, the DFAC, and the

4

toilet/shower/ablution/laundry facility, needed to be completed by no later than 300 days after receiving notice to proceed (*id.* at 70). Appellant required notice to proceed on 28 July 2009 (R4, tab 37), thereby requiring completion of the priority tasks by 24 May 2010, and the entire project by 21 September 2010.[2]

8. The contract incorporated by reference several standard fixed-price construction clauses relevant to the parties' dispute, including FAR 52.232-5, PAYMENTS UNDER FIXED-PRICE CONSTRUCTION CONTRACTS (SEP 2002); FAR 52.233-1, DISPUTES (JUL 2002); FAR 52.236-7, PERMITS AND RESPONSIBILITIES (NOV 1991); FAR 52.236-11, USE AND POSSESSION PRIOR TO COMPLETION (APR 1984); FAR 52.236-15, SCHEDULES FOR CONSTRUCTION CONTRACTS (APR 1984); FAR 52.243-4, CHANGES (JUN 2007); and FAR 52.249-10, DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984) (R4, tab 11 at 29-30).

9. The Payments clause, FAR 52.232-5, states in pertinent part:

> (a) *Payment of price.* The Government shall pay the Contractor the contract price as provided in this contract.
>
> (b) *Progress payments.* The Government shall make progress payments monthly as the work proceeds, or at more frequent intervals as determined by the Contracting Officer, on estimates of work accomplished which meets the standards of quality established under the contract, as approved by the Contracting Officer.
>
> (1) The Contractor's request for progress payments shall include the following substantiation:
>
> (i) An itemization of the amounts requested, related to the various elements of work required by the contract covered by the payment requested.
>
> (ii) A listing of the amount included for work performed by each subcontractor under the contract.
>
> (iii) A listing of the total amount of each subcontract under the contract.

---

[2] These dates were subsequently extended by mutual agreements for reasons not relevant to this decision.

5

(iv) A listing of the amounts previously paid to each such subcontractor under the contract.

(v) Additional supporting data in a form and detail required by the Contracting Officer.

....

(c) *Contractor certification.* Along with each request for progress payments, the Contractor shall furnish the following certification, or payment shall not be made....

I hereby certify, to the best of my knowledge and belief, that—

(1) The amounts requested are only for performance in accordance with the specifications, terms, and conditions of the contract;

(2) **All payments due to subcontractors and suppliers from previous payments received under the contract have been made**, and timely payments will be made from the proceeds of the payment covered by this certification, in accordance with subcontract agreements and the requirements of chapter 39 of Title 31, United States Code; [Bold added]

(3) This request for progress payments does not include any amounts which the prime contractor intends to withhold or retain from a subcontractor or supplier in accordance with the terms and conditions of the subcontract;...

....

(e) *Retainage.* If the Contracting Officer finds that satisfactory progress was achieved during any period for which a progress payment is to be made, the Contracting Officer shall authorize payment to be made in full. However, if satisfactory progress has not been made, the Contracting Officer may retain a maximum of 10 percent of the amount of the payment until satisfactory progress is achieved.

10. The Schedules for Construction Contracts clause, FAR 52.236-15, states in pertinent part:

> (a) The Contractor shall, within five days after the work commences on the contract or another period of time determined by the Contracting Officer, prepare and submit to the Contracting Officer for approval...a practicable schedule showing the order in which the Contractor proposes to perform the work, and the dates on which the Contractor contemplates starting and completing the several salient features of the work (including acquiring materials, plant, and equipment). The schedule shall be in the form of a progress chart of suitable scale to indicate appropriately the percentage of work scheduled for completion by any given date during the period. *If the Contractor fails to submit a schedule within the time prescribed, the Contracting Officer may withhold approval of progress payments until the Contractor submits the required schedule.* [Emphasis added]

11. The Default clause, FAR 52.249-10, states in pertinent part:

> (a) If the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract including any extension, or fails to complete the work within this time, the Government may, by written notice to the Contractor, terminate the right to proceed with the work (or the separable part of the work) that has been delayed....

> (b) The Contractor's right to proceed shall not be terminated nor the Contractor charged with damages under this clause, if—

> (1) The delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the contractor. Examples of such causes include—

> (i) Acts of God or of the public enemy,

7

(ii) Acts of the Government in either its sovereign or contractual capacity,

(iii) Acts of another Contractor in the performance of a contract with the Government,

(iv) Fires,

(v) Floods,

(vi) Epidemics,

(vii) Quarantine restrictions,

(viii) Strikes,

(ix) Freight embargoes,

(x) Unusually severe weather, or

(xi) Delays of subcontractors or suppliers at any tier arising from unforeseeable causes beyond the control and without the fault or negligence of both the Contractor and the subcontractors or suppliers....

....

(d) The rights and remedies of the Government in this clause are in addition to any other rights and remedies provided by law or under this contract.

12. The contract included in full text "SPECIAL" clause 1.22, Time Extensions, which prescribed the procedure to be used for determining time extensions due to unusually severe weather for purposes of the Default clause. The Time Extensions clause stated that the contracting Officer (CO) should determine entitlement to time extensions for unusually severe weather based on the occurrence of "actual unusually severe weather days." These were defined as "days actually impacted by unusually severe weather," with weather severe enough to "prevent work for fifty percent (50%) or more of the Contractor's workday and delay work critical to the timely completion of the project." (R4, tab 11 at 155-56)

13. The contract stated that if the soldiers' barracks, the dining facility (DFAC), and the priority life-support systems were not completed by 1 January 2010, appellant would be responsible for providing temporary facilities or systems to support 700 soldiers until the permanent facilities or systems were in place (R4, tab 11 at 54, 58, 61, 63). Regarding the site electrical distribution system, or power system, the contract stated: *"Power system must be operational by January 01, 2010. If the power system is not completed by this date, the contractor will be required to supply temporary power to the compound"* (*id.* at 54).

14. Per the contract, Highland was required to take partial designs provided by the government and complete the design work so as to meet all requirements and applicable criteria and codes (R4, tab 11 at 47-48). The Corps also furnished Highland

8

with minimum design standards and product requirements, including for acceptable equipment and materials (*id.* at 71-143). Highland was encouraged to propose alternate designs or products that were more commonly used in the region, provided that such alternate designs or products would be equally or more cost effective or allow for more timely completion and would furnish the same system safety, durability, ease of maintenance, and environmental capability as the government's minimum requirements. In proposing such an alternate design or product, appellant was required to submit such information as would allow the CO to make a comparison of the proposed alternate design or product to the Corps' minimum requirements. Once a design or product was approved, any variations would require prior approval by the CO. (*Id.* at 71, ¶ 1.2)

15. The contract required Highland to design and construct all electrical systems for the CSB, including providing all necessary labor, equipment, and material to install a fully-functional system that would interface with Camp Hero's existing electrical system. All major components of electrical equipment were required to bear, securely attached to the equipment, a non-corrosive and non-heat-sensitive plate identifying the manufacturer's name and address; the type or style of the equipment and its voltage and current rating; and the item's catalog number. All such equipment was to be in "new condition, undamaged and unused," and prior to installation such equipment was to be "protected from the weather, humidity and temperature variation, dirt and dust, and any other contaminants." (R4, tab 11 at 131, ¶ 9.3.1) For long lead-time power system components, including transformers, appellant was required to schedule its submittals to allow for "approvals, procurement, delivery and installation to establish permanent power as soon as possible" (*id.* at 132, ¶ 9.4.1.1). The contract established the following minimum requirement for transformers, in relevant part:

> Primary side *load-break* disconnecting means shall be provided with *all transformers*. All transformers shall match existing. Transformer substations shall be *dead front*, loop-feed, pad-mounted, compartmental, self-cooled type. Transformers shall come complete from manufacturer; use of third party transformer housings or add-on transformer housings shall not be permitted. Transformers shall have no exposed live components.

(*Id.* at 134, ¶ 9.4.5) (Emphasis added)

16. The contract required Highland, after coordinating with the CO, to connect the CSB's power distribution system to Camp Hero's existing, active electrical system. To do this, Highland was to install underground "raceways," or conduits, no less than four inches in diameter, consisting either of thin-wall PVC that would be encased in concrete or, in the case of street lighting circuits, hard-wall ("Schedule 40") PVC that

9

would be directly buried without concrete encasement except when passing under paved areas or road crossings. (R4, tab 11 at 134, ¶¶ 9.4.3, 9.4.4)

17. Between 17 August 2009 and 30 March 2011, the parties engaged in negotiations to expand the utility systems requirements of the contract to accommodate 4,300 soldiers instead of the contract's original 1,640. At one point the parties discussed a change to the contract's original requirements regarding the Camp Hero power plant: a requirement for Highland to build an entirely new power plant (R4, tabs 13, 19, 237, 302, 416). These negotiations ultimately proved unsuccessful and concluded on 30 March 2011 with Change Order No. A00004. Change Order No. A00004 reestablished the contract's original requirements regarding the site electrical distribution system, generator fuel storage/distribution, and expansion work to be done on the Camp Hero power plant. (R4, tab 19 at 1-2)

## 2. Arrival of ANA Corps Support Battalion Personnel

18. The ANA soldiers arrived at the CSB site and occupied their quarters and barracks on 3 February 2011 (R4, tab 185, vol. 1, Rpt. 552). Following the ANA battalion's arrival, Highland leased generators and purchased fuel to provide temporary power to the ANA soldiers' quarters and barracks and their toilet/shower/ablution facilities (R4, tab 185, vol. 2, Rpt. 652).

19. Effective on 13 January 2011, the Corps issued Change Order No. A00003 for temporary power to eleven buildings on the CSB site: the three buildings comprising the Bachelor Officer Quarters, the six buildings of the Enlisted Barracks, the Toilet and Shower building, and the DFAC (R4, tab 18 at 1-2). Due to the "urgent nature" of the requirement to provide temporary power for the ANA soldiers' quarters and barracks and their toilet/shower/ablution facilities, Change Order No. A00003 was issued as an undefinitized contract action with a not-to-exceed amount of $1,748,740.00 (*id.* at 2). Of that amount, $575,080.59 would be used to lease generators and pay for their maintenance for three months under a newly-added CLIN, while the balance would be used to pay for generator fuel under a separate CLIN (*id.* at 4). The fuel CLIN was a "Materials" type CLIN, meaning that the Corps would pay for fuel on an at-cost basis without profit or overhead (*id.* at 2, 3, 5), in accordance with FAR 52.232-7, PAYMENTS UNDER TIME-AND-MATERIALS AND LABOR-HOUR CONTRACTS (FEB 2007), which Change Order No. A00003 also added to the contract (*id.* at 6). The Corps anticipated that Change Order No. A00003 would be definitized within three months (*id.* at 2), and expected that the definitized contract action would consist of a single negotiated, firm-fixed-price CLIN for generator leasing and maintenance as well as fuel (*id.* at 7).

10

### 3. Subcontractor Issues

20. On 1 February 2011, one of Highland's principal subcontractors informed the Corps that Highland owed it a "large amount of money" (R4, tab 185, vol. 1, Rpt. 550). The Corps issued Highland a show cause notice, Serial Letter No. C-0049, on 20 April 2011. The Corps identified several "critical items that have yet to be addressed appropriately and continue to hinder current progress," including "[t]he payment of subcontractors, along with a list provided to [the Corps] of all subcontractors and outstanding balances owed to them by [Highland]." (R4, tab 61 at 1) The show cause notice further stated, in relevant part:

> [W]e have noticed that your employee[s] and subcontractors are not on the job site on a regular basis. We have been advised that this is due to your failure to pay them. We have requested that you pay your subcontractor[s] and employees, so that construction could continue. Your subcontractors and your employees still have not received payments to them for work already completed for which the Government has made progress payment to your organization. As a result, they have not returned to work and any progress is insignificant.

(*Id.* at 2)

21. On 4 May 2011, the Corps again heard reports that Highland had not paid one of its principal subcontractors. The subcontractor reported that its employees had not been paid for three months and, as a result, many had quit. The subcontractor also reported that there were insufficient funds to pay for materials, food for the workers, or manpower. (R4, tab 185, vol. 2, Rpt. 642)

22. On 14 May 2011, the owner of the generators that were providing temporary power to the CSB reported to the Corps that Highland had not been paying him and he was considering removing the generators, but that the ANA colonel had threatened to lock down the CSB site if he tried (R4, tab 185, vol. 2, Rpt. 652). The next day, a meeting was held between the Corps, Highland, and three of Highland's principal subcontractors to discuss nonpayment issues (*id.* at 653). Then, on 29 May 2011, a violent protest involving employees of several of Highland's subcontractors and even Highland's own security personnel erupted in Highland's man camp (*id.* at 667; tr. 3/322-27). Two days later, appellant's project manager, Mr. Douglas Seaman, was arrested and briefly detained by the ANA battalion commander (*id.* at 669). Upon his release, Mr. Seaman promptly departed the country (tr. 3/304).

11

23. On 19 September 2011, the parties executed bilateral contract Modification No. P00010, the first in a series of five modifications implementing the parties' "Global Claims Settlement for CSB" (R4, tabs 25-28, 30). Modification No. P00010 resolved any outstanding requests for equitable adjustment relating to work on the CSB (R4, tab 25 at 2). It also significantly redefined the scope of the CSB utility requirements, particularly the requirements regarding the site electrical distribution system and the existing Camp Hero power plant, thereby "establish[ing] an unequivocal starting point for any future changes if required." Respecting the contract's permanent power requirements, Modification No. P00010 stated:

> b. Permanent Power: Provide an electrical ductbank of 6" PVC conduits in accordance with the Electrical Distribution/Duct Bank modification (Mod. No. P00011)....
>
> c. [Camp] Hero Power Plant: With the exception of the 15kV, 250A CSB feed breaker at the power distribution switchgear, delete all other work within the Camp Hero Powerplant. This includes any plant expansion to include the design, purchase and installation of new generators and associated equipment.

(*Id.* at 2-3) Highland was directed to submit to the CO by 3 October 2011 "a proof of purchase and/or similar documents...of all DFAC equipment, long-lead items, and other materials/equipment as contractually required to complete this project" (R4, tab 25 at 2, tab 336).

24. The Electrical Distribution/Ductbank modification, Modification No. P00011 stated in pertinent part:

### A. [S]COPE OF WORK

> Provide an electrical ductbank of 6" PVC conduits . . . . Install a new 250A breaker in the MV[3] load distribution switchgear at the existing [Camp] Hero Powerplant. Provide electrical cabling (120 mm - 2 minimum) from the [Camp] Hero Powerplant MV switchgear to the CSB distribution switchgear. Delete all other work within the [Camp] Hero Powerplant to include the design, purchase

---

[3] "MV" means "medium voltage" (R4, tab 903 at 281, 289).

and installation of new generators and all required
equipment to support the expansion of the power capacity.

(R4, tab 26 at 1-2) Highland was directed to submit for the CO's approval a redesign incorporating the revised duct bank requirements. In order to effectuate Modification No. P00011, the parties agreed to extend the performance period by a total of 421 days, from 4 January 2011 to 1 March 2012. (*Id.* at 2)

25. Bilateral Contract Modification Nos. P00012 and P00014 had the same effective date, 30 September 2011, and both appear to have been intended to accomplish the same thing: definitize Change Order No. A00003, Temporary Power (*see* finding 18; R4, tab 27 at 1-2, tab 30 at 1-2).[4] We find that, between them, Modification Nos. P00012 and P00014 definitized Change Order No. A00003 by adding firm-fixed-price CLIN 0016 with a value of $204,626.41 (R4, tab 27 at 2-3, tab 30 at 2-3).

26. On 12 October 2011, the parties held a "Red Zone" meeting to discuss the path forward with respect to the remaining buildings under construction. The parties agreed that, due to the high costs of providing temporary power to the CSB, the Corps would not accept any more buildings beyond those it had already accepted, namely the ANA quarters and barracks and the showers/toilet/ablution facilities, until appellant had finished connecting the CSB to the Camp Hero power plant as required by Modification No. P00011. (R4, tab 185, vol. 2, Rpt. 803)

27. The last of the global settlement modifications, with an effective date of 8 November 2011, was bilateral Modification No. P00013 (R4, tab 28 at 1). Modification No. P00013 established the parties' approach to providing temporary power "until permanent power can be supplied to the CSB via a [Highland-]installed ductbank to the Camp Hero power plant (contract modification [P00011])." The parties agreed that the Corps would pay the costs of leasing and maintaining the generators and keeping them fueled, but *only* until the parties' revised contract completion date, 1 March 2012:

> The effective date [of the requirement to provide
> temporary power] is the date both parties sign the
> modification to the contract and the end date of temporary
> power is 1 March 2012. The maximum duration of this

---

[4] The record is silent as to why Modification No. P00014 had the same effective date and purpose as Modification No. P00012, although some handwritten notes appearing on the copy of Modification No. P00012 in the record indicate that No. P00014 was simply correcting some errors made in the earlier modification (R4, tab 27 at 2, tab 30 at 2).

13

requirement is until 1 March 2012, at which time [Highland] is required to have permanent power in place, and the government will no longer be responsible for temporary power. *Should temporary power still be required after this date, the contractor shall continue to provide all necessary power at their own cost until the permanent power system is functioning.*

(*Id.* at 2) (Emphasis added) Witnesses for the government and for Highland both testified to their mutual understanding that Modification No. P00013's requirement to provide temporary power would be satisfied when the duct bank system was connected to the existing power plant, regardless of whether the power plant was then capable of generating enough power to supply the entire CSB (tr. 1/84-85, 4/294-95, *see also* R4, tab 380).

28. Highland submitted the redesign required by Modification No. P00011 on 3 December 2011[5] (R4, tab 903, vol. I at 277). Highland's design submission included drawings showing duct banks that consisted of 6-inch Schedule 40 PVC encased in concrete in accordance with the requirements described in Modification No. P00011, (R4, tab 903, vol. I at 285), as well as an electrical distribution system that included ten transformers with circuit-switching mechanisms that would allow power to be shut off to any particular transformer while still allowing power to flow "downstream" to the rest of the system (R4, tab 903, vol. I at 281). Such a circuit-switching mechanism is known as a "load-break" mechanism (tr. 1/280, 2/17). Also attached to Highland's submission was a "100% Resubmittal" design document, dated 3 October 2011, which included a section describing "THREE-PHASE PAD-MOUNTED TRANSFORMERS" (R4, tab 903, vol. II at 888, vol. III at 1399-1406). In it Highland reiterated the contract's requirement for "Dead-Front," "Load-break switch" transformers, as follows in pertinent part:

2.2.1.1    High Voltage, Dead-Front

High-voltage compartment shall contain the incoming line, *insulated high-voltage load-break connectors*, bushing well inserts, feed-thru inserts, six high-voltage bushing wells configured for loop feed application, *load-break switch handle(s)*, access to tap changer handle, connector parking stands with insulated stands with insulated standoff bushings and ground pad.

---

[5] Although the cover page to appellant's 3 December 2011 design submission indicates that it was submitted as required by Modification No. P00010 (R4, tab 903, vol. I at 277), Modification No. P00011 required the redesign submittal (finding 24).

14

....

c. *Load-break switch*

> Loop feed sectionalizer switches: Provide three,
> two-position, oil-immersed type switches to permit
> closed transition loop feed and sectionalizing.

(*Id.*, vol. III at 1399) (Emphasis added) The Corps approved Highland's 3 December 2011 submission on 10 December 2011 (R4, tab 864 at 2).

29. The record is silent as to whether Highland furnished to the CO any proof of having purchased the transformers as required by Modification No. P00010. Nonetheless, the record does include Highland's invoice for the ten transformers, dated 1 May 2011, which shows that Highland ordered ten "Front Dead End, Pad Mounted," "Load Break Switch" transformers (R4, tab 546).

*5. Post Global Settlement Events*

a. November Flooding

30. On 10 November 2011 it rained at the CSB for nearly two hours, resulting in significant flooding at the site (R4, tab 185, vol. 2, Rpt. 833; tr. 1/137-138). It is not apparent from the record, however, which portions of the work were affected or for how long. Highland's witness, Mr. Reardon, testified the duct bank system was impacted because the soil was too wet to dig trenches (tr. 4/254). However, there was no testimony about the length of such delay. Additionally, there is no evidence in the record confirming the exact length of delay or impact, if any, on the overall installation of the duct bank system. For instance, the record includes numerous undated photographs of the flooded worksite around some of the buildings in the northwestern area of the CSB (app. supp. R4, tab 21 at 1-12). However, the "Chronology of Significant Events" for October-November 2011 in Highland's Camp Hero Duct Bank Progress Report for November 2011 does not even mention the 10 November 2011 rainstorm; indeed, according to the Duct Bank Progress Report Highland did not even have a permit to dig inside Camp Hero until 17 November 2011, and digging manholes and trenches for the duct bank system did not actually begin until 19 November 2011 (app. supp. R4, tab 5 at 4-5). The Duct Bank Progress Report includes several photographs, dated 17 November 2011, of trenches and manholes dug on the CSB site, none of which appear to be muddy or to have any water in them (*id.* at 13-20). Photographs of digging-work taking place inside Camp Hero on 19 November 2011 show the earth-moving machine stirring up clouds of dust (*id.* at 23-46). Highland's "Subsidiary Report for Duct Bank Work," dated 18 November

15

2011, makes no mention of flooding or damp conditions but rather reports that, with respect to beginning excavation work for the duct bank system, there are "[n]o problems[;] ok to continue work" (app. supp. R4, tab 6). Both the government's daily Quality Assurance Reports (QARs) and the contractor's daily Quality Control Reports (QCRs) agree that there was work stoppage on 10 November 2011 due to a rain storm. However, although there is mention of damage to buildings, etc., there is no specific mention of delay to proceeding with the duct bank system resulting from the rain. (R4, tabs 184-85)

b. Pakistani Border Closure/Hijacked Transformers

31. The Pakistan border with Afghanistan was closed from November 2011 through July 2012. Highland had ordered the ten transformers required for the site electrical distribution system sometime prior to the border closure. By letter dated 4 December 2011, Highland informed the Corps that three of the ten transformers ordered had been hijacked and stolen in Pakistan and that delivery of the remaining seven transformers would be delayed by the closing of the border (app. supp. R4, tab 9). Despite the border closure, supplies could still enter Afghanistan by air and by other land routes (app. supp. R4, tab 12; tr. 2/15). In fact, despite the Pakistan border closure, seven of the transformers were delivered to the CSB on 4 February 2012. However, when the Corps inspected the transformers upon their arrival, three of them were found to be dead-break transformers, rather than the load-break transformers required by the contract. (R4, tab 185 vol. 2, Rpt. 918) Moreover, the transformers were not in the new, protected condition specified in the contract, but faded by the sun; some were rusty, some were leaking oil (tr. 2/17). The Corps issued Highland a deficiency notice, dated 11 March 2012, for the nonconforming transformers and MV cable disconnects (R4, tab 383). By letters dated 25 March 2012 and 31 March 2012, Highland requested a variance to the approved load-break design in order to use the three dead-break transformers (R4, tabs 385, 389). The Corps denied Highland's variance request by letter dated 3 April 2012 (R4, tab 390).

6. *Progress Payments: Retainage and Withholding*

32. By letter dated 19 March 2011, the Corps directed Highland to submit a revised schedule for the site electrical distribution system by 21 March 2011 (R4, tab 307 at 2). By subsequent letter dated 24 March 2011, the Corps informed Highland that it was past due in submitting a revised schedule and reminded Highland that its failure to provide a revised schedule for review and approval by the CO might delay future progress payments (R4, tab 60). From the latter part of November 2011 through February 2012, every progress payment was subjected to ten percent retainage

due to failure to make progress, lack of performance, failure to submit sufficient resources, or failure to submit an acceptable schedule.[6]

33. The generators providing temporary power to the CSB ran out of fuel on 26 November 2011. In the Corps' report of the incident, the Corps noted that the sporadic availability of water and electricity for its facilities, both dependent upon the temporary power, was causing disciplinary problems among the ANA soldiers at the CSB. (R4, tab 185 vol. 2, Rpt. 848) Mr. Mark Stephenson, who was the resident engineer and a CO's representative on the project from December 2011 until December 2013, testified that without power to those facilities, "it would have been, pretty much, a riot" (tr. 3/201).

34. By letter dated 7 December 2011, the Corps advised Highland that an unsigned, proposed revised schedule that had been delivered to the Corps at the preceding weekly progress meeting was not up-to-date or complete and therefore it was rejected. The Corps advised Highland that "[l]ack of an approved schedule or scheduling personnel shall result in an inability of the [CO] to evaluate Contractor progress for the purposes of payment." (R4, tab 358) Highland submitted another proposed schedule revision, which was also rejected. By letter dated 13 December 2011, the Corps explained that Highland's proposed revision was "very optimistic based on placement to date and anticipated resources for the remaining duration" and "not up to date or complete." The Corps again reminded Highland that lack of an approved schedule might adversely affect the ability of the CO to approve progress payment requests. (R4, tab 360)

35. The generators providing temporary power to the CSB ran out of fuel again on 17 December 2011 (R4, tab 185 vol. 2, Rpt. 869). In a letter dated 25 December 2011, Highland cited maintenance problems, fuel delays, and cash flow issues as

---

[6] Progress Payment No. 37, covering 28-30 November 2011, due to "poor performance" (R4, tab 141 at 1); Progress Payment No. 38, covering 1-15 December 2011, due to "lack of performance" (R4, tab 142 at 1); Progress Payment No. 39, covering 16-30 December 2011, due to "lack of progress" (R4, tab 143 at 1); Progress Payment No. 40, covering 31 December 2011 through 1 January 2012, due to "lack of progress" (R4, tab 144 at 1); Progress Payment No. 41, covering 2-31 January 2012, due to appellant's failure to submit an acceptable completion schedule, "lack of progress," and "failure to commit sufficient resources (R4, tab 145 at 1, tab 374); Progress Payment No. 42, covering 1-15 February 2012, due to "lack of progress" (R4, tab 146 at 1); and Progress Payment No. 43, covering 16-29 February 2012, due to appellant's failure to submit an acceptable completion schedule, "lack of progress," and "failure to commit sufficient resources" (R4, tab 147 at 1, tab 381).

17

causes for the temporary power supply disruptions. The Corps responded by letter dated 28 December 2011 reminding Highland that such matters were Highland's responsibility, not the Corps'. (R4, tab 368)

36. The Corps' QARs for 22 January 2012 noted that Highland's latest progress payment request asked for 50-80% of payment on items the work on which had either not yet begun or had just started. The Corps' QAR for 2 February 2012 noted that Highland had renamed several of the pay activities in its latest progress payment request and included some pay activities the requirements for which were not part of the contract (e.g., hescoes; wash rack fence). The Corps' QARs for 2-4 March 2012 reported that "workers for AZAD[,] a subcontractor for [Highland,] have not been paid in over three months." (R4, tab 185 vol. 2, Rpts. 905, 916, 944-47 at 2)

37. Highland's Prompt Payment Certification and Supporting Data for Contractor Payment Invoice (Progress Payment Request) No. 44, dated 15 March 2012, sought $238,690.88 (R4, tab 182 at 1, 31). Highland represented that the following subcontractor payment amounts, totaling $569,350, were listed in Progress Payment Request No. 44: Akbar Mirzad Group, $20,000; AZAMEL, $25,000; Baktiar Company, $20,000; Ehsan Company, $20,000; HKCC Company, $35,000; JanosFarkas Eng. Supt., $7,000; Kar Neeroo Electrical Co. Ltd.[7], $50,000; Leading Co., $44,350; Malik Express LLC, $25,000; Mumtaz Iqbal Logistic & Supply Co. LTD, $20,000; Omran Consulting, Construction & Engineering, $21,000; Platenuim Co. (PECC), $25,000; SIGC, $247,000; and ZABUL, $10,000. Highland further certified that, as of 15 March 2012, it had never retained any subcontractor earnings. (*Id.* at 1-3) Highland did not invoice for the costs of fuel or maintenance for the temporary power generators (*id.* at 4). The Corps received appellant's Progress Payment Request No. 44 on 25 March 2012 (R4, tab 148 at 1).

38. The Corps did not retain any of Progress Payment No. 44. Instead, the Corps withheld Progress Payment No. 44 in its entirety "because of a lack of progress on site and failure to pay sub-contractors." (R4, tab 148 at 1) The Corps further explained its rationale for withholding all of Progress Payment No. 44 in Serial Letter No. C-0111, dated 25 March 2012. The Corps cited, as the basis for withholding, Highland's failure to submit an acceptable schedule; Highland's lack of progress and failure to commit sufficient resources; and appellant's failure to pay its subcontractors and to provide the Corps with evidence of payment. As authority for its decision to withhold the entire progress payment, the Corps referred to FAR 52.232-5(e) and "paragraph (2) of the Prompt Payment Certificate." (R4, tab 75)

---

[7] Kar Neeroo Electrical Engineering (Kar Neeroo) was the subcontractor responsible for digging the trenches, installing the conduits, and pulling the cable for the site electrical distribution system (R4, tab 185, vol. 2 Rpt. 978; app. supp. R4, tab 5).

39. The Corps issued Highland a cure notice, dated 28 March 2012, for failing to complete several facilities by the 1 March 2012 construction-completion date. The first item identified by the Corps in its list of incomplete facilities was the power distribution system. (R4, tab 77 at 1) The Corps notified Highland that it considered Highland's failure to complete the facilities to be a condition endangering the timely completion of the contract and directed Highland to submit a revised construction schedule "that is reasonable and agreeable to the Government" within 10 days of appellant's receipt of the cure notice (*id.* at 2).

40. By letter dated 28 March 2012, Highland responded to the Corps' Serial Letter No. C-0111 objecting to the Corps' decision to withhold all of Progress Payment No. 44 on the basis of FAR 52.232-5(e), which Highland argued only allows retainage of up to 10% of a progress payment, and "point[ed] out that [the Corps'] withholding of payment could add additional delays to the project...[and] that there will undoubtedly be more complaints as withholding [the] payment will directly impact the subcontractors that are expecting payment from [the] proceeds" (R4, tab 76).

41. At some point in early April 2012, Highland provided the CO with "Confirmation[s] of Cash Receipt" signed by the representatives of several of its subcontractors and by Highland's Construction Manager, Mr. John Reardon, all of which were dated 1 April 2012 (R4, tab 78). The subcontractors whose representatives signed "Confirmation[s] of Cash Receipt" were the Azad Company, whose representative Mr. Nestor A. Bersula confirmed receipt of $75,000 for "labor against contract" (*id.* at 1); Zabul Pashton, whose representative Mr. Bashir Ahmad confirmed receipt of $77,000 for "DEFAC contract work" (*id.* at 2); and "EKCC," or Ehsahullah Karimi Construction Company, whose representative Mr. Jay-ar G. Maglalang confirmed receipt of $50,000 for "Agreement between HLH/COE/EKCC" (*id.* at 3). Attached to EKCC's "Confirmation of Cash Receipt" were two spreadsheets purporting to be its employee-payroll for CSB work for January and February 2012 (*id.* at 4-7). Of these subcontractors, only Zabul Pashton, presumably listed as "ZABUL," was identified in Highland's Progress Payment Request No. 44 as being included in the payment estimate, and that was only $10,000; EKCC did not even appear among the subcontractors listed (R4, tab 182 at 1, 31).

42. On 4 April 2012, a meeting was held between the Corps, Highland, and Highland's electrical duct-bank system subcontractor, Kar Neeroo, regarding non-payment issues. The subcontractor reported that it was owed approximately $680,000. (R4, tab 185 vol. 2, Rpt. 978)

43. Highland responded to the Corps' 28 March 2012 cure notice by letter, dated 7 April 2012, with a proposed revised schedule attached. Highland informed the Corps, however, that unspecified "delays and interruptions with progress payments could adversely affect the submitted time schedules." Highland also advised the Corps that it intended to "submit a comprehensive report within the next seven to ten days, detailing all pertinent

issues relating to the project with particular emphasis [on] subcontractor payments and progress on Permanent Power to the site." (R4, tab 80)  Highland's proposed revised schedule stated that procurement of the transformers should have been completed by 9 April 2011 (R4, tab 79 at 4); that excavation of trenches for the duct bank system, laying of conduits, construction of manholes/handholes, and backfilling and compaction had *already been completed* on 6 April 2012; that installation of "transformers 7" and "transformers 3" would be done by 21 May 2012; that execution of the work specified in Modification No. P00010[8] would begin on 22 May 2012 and be completed by 10 June 2012; that the MV load distribution switchgear work added by Modification No. P00011 had *already been completed* on 1 April 2012 (*id.* at 32); that cable pulling to the CSB would be complete on 16 May 2012 (*id.* at 33); and that all of the electrical distribution system work would be completed by 22 June 2012 (*id.* at 9).  Although Highland's proposed revised schedule did not contemplate the energization of the site electrical distribution system until 3 July 2012, it inexplicably provided that temporary power would cease on 21 May 2012 and that provision of diesel fuel for the generators would end on 29 April 2012 (*id.* at 33).  Highland's proposed revised schedule did not identify anything as being on the critical path, nor did it identify any delay to any part of the work – whether occurring before, during, or since November 2011 – or give any indication whatsoever as to the duration of such a delay or its effect upon the schedule (*id.*).

44. Highland's Progress Payment Request No. 45, dated 31 March 2012, sought $76,829.81 (R4, tab 183 at 1, 31).  Highland represented that subcontractor payment amounts, totaling $202,000, were listed in Progress Payment Request No. 45 as follows:  AZAD AFGHANISTAN Construction Company, $75,000; HKCC Company, $50,000; and ZABUL, $77,000 (*id.* at 1-3).  Notably, except for HKCC and EKCC the subcontractors and amounts identified correspond to the Confirmations of Cash Receipt that appellant had previously provided to the Corps (*see* finding 41).  As it did in its Progress Payment Request No. 44 (*see* finding 40), appellant certified that it had not, to date, retained any subcontractor earnings (R4, tab 183 at 1-3).  Appellant did not invoice for the costs of fuel or maintenance for the temporary power generators (*id.* at 4).  The Corps received Progress Payment Request No. 45 on 10 April 2012 (R4, tab 149 at 1).

45. As with Progress Payment No. 44, the Corps did not retain any of Progress Payment No. 45 but rather withheld the progress payment altogether.  The Corps withheld all of Progress Payment No. 45 for "lack of payment to subcontractors, lack of approved schedule, and lack of progress." (R4, tab 149 at 1)

---

[8] It is unclear what work Highland was referring to in this portion of its schedule; as previously discussed, Modification No. P00011, not No. P00010, established additional work for the site electrical distribution system (*see* finding 25). However, the work added by Modification No. P00011 is identified elsewhere in appellant's schedule (R4, tab 79 at 32-33).

## 7. Termination and Appeal

46. By Serial Letter No. H-0007, dated 14 April 2012, Highland notified the Corps that "as of April 20, 2012 [Highland] will no longer be fueling or paying the lease for the generators that were used to provide temporary power" to the site. Highland continued as follows:

> We feel this is most unfortunate but regrettably we cannot afford to fund your modification. If you would like this temporary service to continue please pay our invoices for this service.
>
> We do not feel that the delay in delivering the permanent power is something we could have controlled and we do not feel that there is any precedent for your refusal to pay for this modification until the issues of permanent power can be worked out. We need to know as soon as possible of your intentions for this service so we can coordinate the requirements for this MOD; if it is your desire for this service to continue uninterrupted.

(R4, tab 81)

47. In Serial Letter No. H-0004, dated 14 April 2012 – about a week after submitting its proposed revised schedule – Highland argued that its ability to complete the work on time had been hampered by numerous "unforeseen and uncontrollable" causes of delay. Highland identified "Incident A" as "Delay in Power to the Site," which consisted of "[a] NATO action at the Afghanistan-Pakistan border [that] caused Pakistan to close the border" that "delayed the delivery of key components to the underground electrical system" and "also allowed 3 of the transformers to be hijacked while the shipment sat idle for weeks at the border." Also, Highland asserted that the requirement for a 250A breaker in the MV load distribution switchgear required by Modification No. P00011 was "not what is required," and "[w]hen we tried to get clarification we met resistance and an uncooperative attitude." Finally, there was the matter of the nonconforming transformers:

> [T]he transformers [that were delivered to] the site do not meet the specified...configuration; we have researched the difference between what is there and what was specified and find that *what we have delivered is superior to the specified type* especially considering the remote location. *We submitted a request for variance only to*

21

> *have it flatly rejected*; no explanation or comment....
> This will add additional delay to the power as we will
> have to bring a factory[-]trained technician to the site to
> make the changes.

(R4, tab 82 at 1) (Emphasis added)  Highland identified "Incident B" as "ANA Project Interference," which consisted of "disruption and delay [the ANA battalion] routinely brings to the project, locking up our managers, and harassing our employees whenever something in [the barracks or shower/toilet/ablution facilities] goes wrong," including "one encounter when a member of the ANA assaulted one of our employees." Additionally, Highland argued that the close proximity of the site to the ANA barracks precluded Highland from making up lost time by means of night work, and the ANA "[would] not allow any Pakistani workers on the CSB site." Highland's "Incident C," "Poor Subcontractor Performance," ranged from its alleged inability to terminate even non-performing subcontractors due to the nature of the Afghan legal system, to outright fraud and bribery by subcontractors, to subcontractors with "hidden agendas" who had been overpaid yet still complained to the Corps about lack of payment. (*Id.* at 2)  Finally, "Incident D," which Highland identified as "Weather Delays," referred to the heavy rainfall during the second week of November 2011, but did not identify how many days were actually impacted by unusually severe weather, as required by the contract's Time Extensions clause (*see* finding 10) (*id.* at 2-3).  Highland did not identify whether any critical path work was delayed by the alleged "incidents," nor did appellant indicate the duration of any such delays.

48.  The Corps responded with Serial Letter No. C-0116, dated 15 April 2012. The Corps asked Highland to "[p]lease clarify...that as of April 20, 2012, [Highland] will refuse to supply the fuel and generators that supply temporary power for the ANA [CSB] project as required by modification P00013" by no later than noon, Afghanistan time, on 16 April 2012.  (R4, tab 83)

49.  Highland responded to the Corps' letter on 16 April 2012 stating:

> We have informed the [Corps] that 100% withholding of
> all payments for CSB will have serious consequences to
> the project.  In your letter C-0116 you state we are
> "refusing" to supply the fuel and generators for
> temporary power; we do not wish to enter into a battle of
> semantics but we are not refusing.  We simply do not
> have the money to pay for this.  The MOD P00013, if it is
> still active[,] requires that we be compensated for the
> supply of the generators and the fuel to run them.  We
> have not received the compensation for...supplying this
> service as our approved invoice has been denied.

22

Therefore[,] as you are refusing to pay for this service[,] we will no longer be able to supply it according to the terms of MOD P00013.

(R4, tab 84)

50. By Serial Letter No. C-0117, dated 18 April 2012, the Corps advised Highland that "[a] Government inspection of the CSB project site over the last several days has revealed that [Highland] is only averaging approximately 25 construction personnel working mainly on the 7 buildings near completion." The Corps noted that it had not observed any of Highland's workers on some of the larger buildings and stated that the "lack of work force makes it apparent that [Highland] has abandoned its worksite, or is preparing to do so." The Corps directed Highland, if it "disagree[d] that [it had] no interest in continuing with the [work]," to "provide a corrective action plan to mitigate the issue of lack of progress." Finally, the Corps advised Highland that "it has been brought to the Government's attention that select [Highland] employees have not recently received their payrolls" and ordered Highland to "immediately show evidence of employee payments." (R4, tab 85)

51. The parties held a progress meeting on 20 April 2012 (R4, tab 86). While the meeting minutes reflect that Mr. Reardon stated that Highland was "currently financially insolvent from his perspective" (*id.* at 1), Mr. Reardon subsequently contested that portion of the meeting minutes (R4, tab 800 at 5, tab 805; tr. 4/279). Mr. Reardon did not, however, dispute the following portion of the meeting minutes:

a) Without financing, continued power via the generators and storage tanks leased from an outside supplier was no longer feasible beyond 22 APR 2012.

b) Extra fuel was currently available for 2 days of power. No further provisions have been made by the contractor beyond that period. It is expected that the current fuel will run out on 22 APR 2012.

c) Power outages were principally caused by mechanical failure. The personnel in charge of maintaining the generators have not been paid for two months. Without personnel to perform maintenance function[s], a higher likelihood and occurrence of these events would occur.

Mr. Reardon also informed the government that [Highland] headquarters had instructed him to pull the generators on 20 APR 2012. However, Mr. Reardon had

not done so due to the safety concerns of the personnel on site and those that occupy the man camp.

(R4, tab 86 at 1) The meeting minutes reflect that when asked about appellant's plans to finish the project, Mr. Reardon stated:

> [H]e could not complete the project. He informed the Government that without financing from his company he could not complete the electrical wire for primary power distribution. He also stated that he and his personnel have not been paid for two months and that if their workers were not funded they intended to leave the site sometime around May 1st, 2012.

(*Id.* at 2, ¶ 6, tab 800 at 5, tab 805) According to the meeting minutes, the area engineer, Mr. Tony Oby, then informed Mr. Reardon that:

> [H]e was to contact his company and inform them that the Government considers [Highland] as having abandoned the job site. As such, the government will not disburse any funding on CSB...until [a Highland] principal presents himself to [the Corps] to explain their company's plan for completion of the CSB...project.

Mr. Oby further informed Mr. Reardon that this principal should present himself by no later than Sunday, 22 April 2012. (R4, tab 86 at 3)

52. Highland responded to the Corps' Serial Letter No. C-0117 and the minutes of the parties' 20 April 2012 meeting with its Serial Letter No. S-0010. Highland objected to the Corps' assertions that it had abandoned the site and to the Corps' direction to produce a principal by 22 April 2012, stating: "If it is your desire that a principal return to the site you should provide proper notification with a reasonable date." Highland accused the Corps of "using tactics that are not supported by the FAR's [sic] and showing bad faith in negotiations and agreements made at the local level," and of "deliberately trying to destroy our business...using an ends justifies the means mentality to accomplish this goal." Highland concluded its letter, however, by stating that "we are committed to completing our Kandahar projects." (R4, tab 87)

53. Highland emailed its Serial Letter No. S-0010 on 21 April 2012 to the Corps at 10:07 local time. The Corps responded by email an hour later, directing appellant to "notify the Government as to exactly when the generators and fuel tanks will be removed." (R4, tab 88 at 4)

24

54. On 22 April 2012, Highland sent the Corps Serial Letter No. S-0110 summarizing a "LIFE SUPPORT TAKE OVER PLAN" discussed during a meeting between appellant and the Corps that occurred on 21 April 2012. The letter, signed by Mr. Reardon, cautioned the Corps that:

> I am ordered by the HLH headquarters to remove the rental generators (4)...as of Sunday the twenty second of April or before.
>
> ....
>
> Any and all disruptions in [the three major life support systems: power, water, and waste removal] elicit[] an immediate response from the ANA where they are very angry and demand resolution forthwith.

(R4, tab 803 at 1)

55. By email on 22 April 2012, at 8:18 local time, Highland's Engineer Mujtaba informed the Corps that Highland had "decided to displace the generators and fuel tank today," and that he would give the Corps an update when they were displaced (R4, tab 88 at 3-4). Within five minutes, the Corps responded by email to remind Highland that, "[a]s discussed with John Reardon yesterday, [Highland] shall not remove the fuel tanks, they are Government property." The Corps reiterated its concerns regarding the fuel tanks with another email ten minutes later: "[Y]ou are not to touch the fuel tanks as they are government property. You are to notify immediately once your guys set foot on ground to disrupt the power generation at the CSB." (*Id.* at 3)

56. At 9:01 local time on 22 April 2012, appellant sent the Corps an email stating: "To let you know with the disrupt of power for CSB; our guys are standby to disconnect the power now so [w]e are waiting for your kind response in this regard." The Corps responded by email at 9:06 local time, notifying Highland that "it is your contractual obligation to keep power running to the barracks and occupied facilities at the CSB" and asking "how are you planning to rectify the situation?" (R4, tab 88 at 2) Highland did not respond to the Corps' 9:06 email, and at 10:22 the Corps sent appellant an email that stated in pertinent part:

> I have been notified that the fuel for the temporary generation has run out at the CSB construction site. I reiterate that it is your contractual obligation to provide temporary power to the project site until you are able to complete the remaining construction. Please respond to

this email ASAP with your corrective action to restore
temporary power.

If I don't receive a response from you within the next
hour, I will take your non-response as concurrence that
you do not have a corrective action. I await your response
by 11:21 AM.

(*Id.* at 1-2) At 11:23, the Corps sent appellant the following email:

John, Willie, Bill & Sabah, as of 11:21 AM we have
received no response from you providing a corrective course
of action, with respect to continuing to provide temporary
power to the CSB project. With that being said, it is this
office's position that you have breached your contract.

(*Id.* at 1) Highland responded to the Corps' 11:23 email at 1:41, stating: "As far we are
in progress [Highland] HQ has already sent the attached serial letters regarding this
issue." Attached to Highland's 1:41 email were Highland's Serial Letter No. H-0004
(*see* finding 50); appellant's Serial Letter No. H-0008 (*see* finding 52); a document titled
"CS45 (Revise Schedule)"[9]; and appellant's Serial Letter No. H-0007 (*see* finding 49).
(R4, tab 88 at 1)

57. At 2:24 local time on 22 April 2012, the Corps issued the following
direction to another contractor, ITT Exelis Mission Systems (ITT), to take over the
task of providing temporary power to the CSB:

Please proceed with the hookup, testing, startup, etc. of the
new system. The Commander wants to emphasize safety
and if ITT feels threatened or is threatened, please
withdraw immediately and let us know.

(R4, tab 90 at 1-2) At 3:02, ITT informed the Corps by email that:

We went to hook up the power to the CSB just now and
found that [Highland] had turned their generator back on
and was supplying power.

We directed our people to stop and wait for additional
guidance.

---

[9] It is not apparent from the record whether this is the same proposed revised schedule
  that was attached to appellant's Serial Letter No. H-0005 (*see* finding 46).

At 3:15, ITT sent the Corps another email: "[Highland] just switched the power back off. We're working with the [Corps] to resolve this issue." (*Id.* at 1)

58. The Corps' Quality Assurance Report for 22 April 2012 states: "It is unclear who shut the electrical power off for the barracks and latrine. [Highland] claims that they didn't [and] that the O&M contractor did so" (R4, tab 185, vol. 2, Rpt. 996).

59. At 10:38 on 23 April 2012, Highland's Safety Manager, Willie Fouche, sent the Corps the following email:

> I like to inform you that we run out of diesel for the generator at the ANA barracks.
>
> We have a small amount of diesel in our generator to supply water for the ANA.
>
> We don't have any person that will supply us with diesel without any money to pay for it.

(R4, tab 91)

60. On 23 April 2012, the Corps issued Serial Letter No. C-0119 terminating the contract for default. The justification given by the CO for the default termination was appellant's failure "to provide temporary power...according to the agreement signed by both parties on November 10, 2011," bilateral Modification No. P00013 (R4, tab 2 at 6; *see* finding 27). The CO offered the following explanation in the termination decision:

> [Highland] first informed the Government on April 14, 2012, via serial letter H-0007, that as of April 20, 2012 [Highland] would no longer fuel or pay the lease for the generators that were being used to provide temporary power to CSB site. In serial letter H-0007 [Highland] claimed that if the Government continued to refuse payment on [Highland's] pay requests numbered 44 and 45 temporary power service would be interrupted. Further, when the Government, on April 15, 2012 requested adequate assurances that [Highland] would continue to provide temporary power [Highland] again reiterated that unless the Government compensated [Highland,] service would not be supplied according to the terms of modification P00013. [Highland's] assertion that the Government's failure to approve pay requests numbered 44 and 45 would lead to a

27

disruption in temporary power is uncontainable [sic].
According to our records [Highland] has been paid for
[CLIN] 0017 in the amount of $1,782,790.76 out of the
$1,916,895.14. No further disbursements have been made
due to the overpayment on this project. [Highland] has
completed 86.5% of project; however, [Highland] has been
paid 89% of the contract value. There is currently 2.5%
($903,553.79) of uncompleted work that has been paid, this
is considered overpayment.

[Highland] has given the Government many excuses
as to why the permanent power was not in place as of
March 1, 2012. Irrespective of any excuse [Highland] had
a contractual obligation to provide temporary power and
[Highland] stopped providing temporary power....
[Highland's] failure to provide temporary power to the
CSB site is a breach of [Highland's] contractual duties....

(R4, tab 2 at 6)

61. On 29 April 2012, HLH responded by letter to the termination notice taking exception to the notice (R4, tab 92).

62. On 19 July 2012, appellant timely appealed to this Board from the default termination.

## DECISION

A termination for default is a "drastic sanction...which should be imposed (or sustained) only for good grounds and on solid evidence." *J.D. Hedin Constr. Co. v. United States*, 408 F.2d 424, 431 (Ct. Cl. 1969); *see also MIC/CCS, JV*, ASBCA No. 58242, 14-1 BCA ¶ 35,612 at 174,434. The government bears the initial burden of proving the propriety of the default termination. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987); *New Era Contract Sales, Inc.*, ASBCA No. 56661 *et al.*, 11-1 BCA ¶ 34,738 at 171,022. If the government carries its burden, the burden then shifts onto appellant to show that the default was excusable, *ADT Constr. Grp., Inc. by Timothy S. Cory, Ch. 7 Tr.*, ASBCA No. 55358, 13 BCA ¶ 35,307 at 173,312, either because the government materially breached the contract thereby discharging appellant's duty to perform, *McDonald Welding & Mach. Co.*, ASBCA No. 36284, 94-3 BCA ¶ 27,181 at 135,442; the failure was beyond appellant's control and without its fault or negligence or that of its subcontractors or suppliers; or the CO's default decision was arbitrary or capricious or an abuse of discretion, *Shubhada Indus., Inc.*, ASBCA No. 54016, 08-1 BCA ¶ 33,733 at 167,017.

The government argues that it was justified in exercising its right under common law to terminate the contract for default because appellant anticipatorily repudiated the contract by refusing to provide temporary power to the ANA barracks without additional compensation (gov't br. at 65-67) and by failing to respond adequately to the government's 28 March 2012 cure notice (*id.* at 59, 69-70), and because appellant actually repudiated the contract by interrupting the temporary power on 22 April 2015 (*id.* at 59, 68-69). The government argues alternatively that the default termination was proper because appellant's refusal to provide temporary power breached its duty to proceed under the Disputes clause (*id.* at 67) and because the CO reasonably believed that appellant failed to prosecute the work with the diligence necessary to ensure its completion by the date agreed upon (*id.* at 50-57, 61-62).

Appellant contends that its refusal to provide temporary power to the ANA barracks was excused because the government improperly withheld two entire progress payments, thus materially breaching the contract and rendering appellant financially unable to buy fuel to run the temporary generators (app. br. at 43-50). Alternatively, appellant argues that it was entitled to an equitable adjustment of time totaling "at least 5.5 months (from March 1, 2012 to August 28, 2012)" (*id.* at 50, 57), due to numerous "excusable delays," including severe flooding in November 2011; the Afghanistan government's expulsion of skilled Pakistani workers in the fall of 2011; the closure of the border between Afghanistan and Pakistan from November 2011 through July 2012, which resulted in a "freight embargo"; the hijacking of critical transformers along the Pakistani border in November 2011; security issues; and "substantial ongoing changes to the power, potable water and sanitary sewer systems, which were never resolved" (*id.* at 51, 55-56, 64). Appellant also argues that, by waiting until 23 April 2012 to terminate the contract, the government waived its right to terminate the contract for delay (*id.* at 58-59). Finally, appellant argues that the government's termination decision was improper because the CO failed to provide a cure notice prior to terminating the contract (*id.* at 63); failed to consider potential "excusable delays" (*id.* at 60-61); and failed to perform an analysis of the factors set forth at FAR 49.402-3 (*id.* at 62).

A. Anticipatory Repudiation

      1. *Appellant anticipatorily breached the contract by refusing to continue providing temporary power without additional compensation*

Paragraph (d) of the contract's Default clause states that the government's termination rights and remedies as set forth in paragraph (a) "are in addition to any other rights and remedies provided by law or under this contract" (finding 11). Paragraph (d) of the Default clause thus reserves the government's common law rights, *All-State Constr., Inc.*, ASBCA No. 50586, 06-2 BCA ¶ 33,344 at 165,341-42, including its summary right to terminate a contract for default following a contractor's anticipatory repudiation of its

29

contractual obligations, *G&G W. Painting, Inc.*, ASBCA No. 50492, 01-2 BCA ¶ 31,492 at 155,484 (citing *DWS, Inc.*, ASBCA No. 33245, 87-3 BCA ¶ 19,960); *cf. Scott Aviation*, ASBCA No. 40776, 91-3 BCA ¶ 24,123 at 120,726 ("The Government, however, retains its common law right to terminate the contract...when the contractor has anticipatorily repudiated the contract.").

In order to demonstrate an anticipatory repudiation, the government must show appellant "communicated an intent not to perform in a positive, definite, unconditional and unequivocal manner, either by (1) a definite and unequivocal statement by the contractor that it refuses to perform or (2) actions which constitute actual abandonment of performance. *Production Services & Technology, Inc.*, ASBCA No. 53353, 02-2 BCA ¶ 32,026 at 158,293 (quoting *Jones Oil Co.*, ASBCA No. 42651 *et al.*, 98-1 BCA ¶ 29,691 at 147,150).

The record clearly shows that appellant positively, definitely, unconditionally, and unequivocally refused to continue providing temporary power without additional fuel payments by the government. Here, appellant by its 14 April 2012 letter and communications and actions through 23 April 2012 positively, definitely, unconditionally, and unequivocally refused to provide power as required by Modification No. P00013 unless it received additional payment for doing so (findings 46, 49, 51, 54-55, 59). Appellant's attempt to suggest in its 16 April 2012 letter that it is somehow *not* refusing to provide temporary power, while demanding additional payment for it (finding 49), does not change the character of its earlier letter. A party's refusal to perform its contractual obligations in the future without a change to the contract has been held to constitute anticipatory repudiation. *Free & Ben, Inc.*, ASBCA No. 56129, 11-1 BCA ¶ 34,719 at 170,954 (refusing to perform without a change to the contract is anticipatory repudiation); *Howell Tool and Fabricating, Inc.*, ASBCA No. 47939, 96-1 BCA ¶ 28,225 at 140,941 (anticipatory repudiation where contractor manifested a positive and unequivocal intention not to render performance until it received a contract price increase). We conclude that appellant's correspondence of 14-23 April 2012 was an anticipatory breach of appellant's obligation to provide power. Appellant did not refuse to perform the contract altogether, however, so whether appellant's refusal to provide power was an anticipatory repudiation depends on whether the obligation to provide power was a material requirement of the contract.

2. *Appellant's anticipatory breach was material and thus it was a repudiation*

A breach is material if it relates to a matter of vital importance or goes to the essence of the contract. *Tzell Airtrak Travel Grp. Corp.*, ASBCA No. 57313, 11-2 BCA ¶ 34,845 at 171,410 (citing *Thomas v. HUD*, 124 F.3d 1439, 1442 (Fed. Cir. 1997)). "The standard of materiality for the purposes of deciding whether a contract has been breached 'is necessarily imprecise and flexible.'" *Stone Forest Indus., Inc. v.*

*United States*, 973 F.2d 1548, 1550-51 (Fed. Cir. 1993) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 241 cmt. a). In determining the materiality of a breach, we may consider some or all of the "significant" circumstances from THE RESTATEMENT (SECOND) OF CONTRACTS § 241:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with the standards of good faith and fair dealing.

*Consumers Oil Co.*, ASBCA No. 24172, 86-1 BCA ¶ 18,647 at 93,713-14. "[I]t is not to be expected that, in every case, each of the five [§ 241] circumstances will be pertinent.... It is to be expected, however, that circumstance (a) ('the extent to which the injured party will be deprived of the benefit which he reasonably expected') will always be a pertinent consideration." *Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1312 (Fed. Cir. 2004); *see also Consumers Oil*, 86-1 BCA ¶ 18,647 at 93,713-14 (it is "important" to consider the extent to which the injured party will be deprived of the benefit of the exchange). Ultimately, whether a breach is a material breach depends on the nature and effect of the violation in light of how the particular contract was viewed, bargained for, entered into, and performed by the parties. *Stone Forest*, 973 F.2d at 1551.

The record before us indicates that the obligation to provide power was material. We first begin with an examination of the plain language of the contract, construing the contract so as to effectuate its spirit and purpose and giving reasonable meaning to all of its parts. *ECCI-C Metag, JV*, ASBCA No. 59031, 15-1 BCA ¶ 36,145 at 176,420. From the outset, the contract identified the site electrical distribution system as a priority life-support system and required appellant to provide temporary power to the soldiers' facilities on the CSB until they were connected to a permanent power source (Finding 13). The parties reaffirmed the essentiality of this requirement with their bilateral Modification No. P00013 which, while allocating the risk of providing temporary power to the

31

government up to a specified date and thereafter to appellant, established beyond cavil that temporary power would be provided to the CSB until permanent power was connected (*see* finding 27). That the parties agreed not to turn over any more buildings to the government until the CSB power system was connected to the Camp Hero power plant (*see* finding 26) underscores the importance of providing temporary power to the soldiers' facilities: while the parties had some latitude to determine when power could be provided to non-life-essential facilities, they had no such latitude with respect to essential life-support systems such as power, water, and waste removal. A failure to any of those systems would render the CSB quarters, barracks, and shower/toilet/ablution facilities unusable to the ANA soldiers and thereby wholly deprive the government of its expectations under the contract. *See* RESTATEMENT (SECOND) § 241(a). Moreover, the parties were aware that the ANA soldiers had, on repeated occasions, reacted to short-duration power interruptions, and both the government and appellant had good cause to believe that a longer power interruption might result in rioting and mayhem (*see* findings 33, 54). In short, the government could not be adequately compensated for the harm could result from a failure to provide power. *See* RESTATEMENT (SECOND) OF CONTRACTS § 241(b). Providing temporary power to the CSB was a material requirement of the contract; appellant's refusal to do so was therefore an anticipatory repudiation.[10]

### 3. *The requirement to provide power was non-severable*

Whether the repudiation of one contract requirement justifies termination of the entire contract depends on whether that requirement is severable from the rest of the contract work. When a contract requirement is severable or divisible and a contractor is delinquent in only that one aspect of the contract work, it is improper for the CO to terminate for default the entire contract. *Overhead Elec. Co.*, ASBCA No. 25656, 85-2 BCA ¶ 18,026 at 90,470-71, *aff'd*, 795 F.2d 1019 (Fed. Cir. 1986) (table). In *Stone Forest*, 973 F.2d at 1552 (citing RESTATEMENT (SECOND) OF CONTRACTS §§ 237, 240), the court stated:

> If only a severable portion of a contract was breached, the non-breaching party can recover damages for that portion of the contract but its remaining contractual duties are not discharged. However, if a contract is not clearly divisible, in accordance with the intention of the parties, the breaching party cannot require the non-breaching party to continue to perform what is left of the contract."

---

[10] Although the government argued anticipatory repudiation (gov't br. at 65-69), appellant did not address anticipatory repudiation in either its post-hearing brief or surreply brief. Appellant does not contend that the temporary power requirement is severable from the remainder of the contract.

32

Determining whether portions of the work under a single contract are divisible from the balance of the contract is not an easy question, as there is no bright line rule for determining contract severability. *Aptus Co. v. United States*, 62 Fed. Cl. 808, 812 (2004) (citing JOHN CIBINIC, JR. & RALPH C. NASH, JR., ADMINISTRATION OF GOVERNMENT CONTRACTS 963 (3d ed. 1995)). Contracts may be considered severable or divisible where corresponding parts of the performances promised by each party may be regarded as agreed equivalents. *Consumers Oil*, 86-1 BCA ¶ 18,647 at 93,709. This principle, which is meant to mitigate the risk of unjust forfeiture, is expressed in section 240 of the RESTATEMENT (SECOND) OF CONTRACTS, as follows:

> If the performances to be exchanged under an exchange of promises can be apportioned into corresponding pairs of part performances so that the parts of each pair are properly regarded as agreed equivalents, a party's performance of his part of such a pair has the same effect on the other's duties to render performance of the agreed equivalent as it would have if only that pair of performances had been promised.

Several factors guide the analysis of severability, such as whether the requirements are capable of being performed separately and whether the conduct of the parties suggests that they are "separate in character." *Bulova Techs. Ordnance Sys. LLC*, ASBCA No. 57406, 14-1 BCA ¶ 35,521 at 174,098-99. In determining the severability of contract requirements, we look to "the intent of the parties, as gleaned from the four corners of the instrument," *Pennsylvania Coal & Coke Corp. v. United States*, 108 Ct. Cl. 236, 250 (1947), "the nature of the work required by the contract, and the contract's overarching purpose," *Aptus*, 62 Fed. Cl. at 812. *See, e.g., Bulova*, 14-1 BCA ¶ 35,521 at 174,099; *Plum Run, Inc.*, ASBCA Nos. 46091, 49203, 05-2 BCA ¶ 32,977 at 163,365-66 (considering interrelatedness of construction subCLINs); *Overhead Elec.*, 85-2 BCA ¶ 18,026 at 90,471-72 (considering line-item pricing structure in a lump sum construction contract); *R.E. Lee Elec. Co.*, ASBCA Nos. 6195, 6447, 61-1 BCA ¶ 3002 at 15,606 (considering parties' communications during performance, as well as the structure of the reprocurement contract).

The record indicates that the requirement to provide power was not severable from the rest of the work under the contract. Again, we begin our analysis with the contract. As discussed, the contract terms of the site electrical distribution system and of bilateral Modification No. P00013 clearly established the requirement to provide temporary power to the CSB until permanent power was connected (findings 13, 27). The original site electrical distribution system requirement wholly and inseparably included this requirement to provide temporary power (*see* finding 13). Although Change Order No. A00003 (finding 19) and the subsequent Modification No. P00013 (finding 27) established a complicated series of subCLINs to cover the costs of leasing generators,

paying for fuel and maintenance, and moving or demobilizing generators, those CLIN structures did not create a separate, agreed-equivalent pair of obligations capable of standing alone apart from appellant's requirement to connect the site electrical distribution system to the power plant. By the very terms of Modification No. P00013, the subCLINs related to leasing, maintaining, and fueling the generators expired on 1 March 2012 *regardless* of whether temporary power was still required. The overarching obligation to provide temporary power to the CSB could be discharged *only* by the connection of the site electrical distribution system to the Camp Hero power plant (finding 27). Thus, the requirement to provide temporary power is inextricable from the requirement to complete the site electrical distribution system. Accordingly, we hold that the requirement to provide temporary power is not severable from the requirement to connect the site electrical distribution system to the Camp Hero power plant. *Cf. Aptus*, 62 Fed. Cl. at 813 (contract not severable given the "interdependent nature of the several tasks, and the unified purpose to which they are a part"); *Overhead Elec.*, 85-2 BCA ¶ 18,026. Nor is the site electrical distribution system requirement severable from the rest of the contract. During their global settlement negotiations, and prior to executing Modification No. P00013, the parties agreed that the government would not accept any more buildings until the CSB power system was connected to the Camp Hero power plant (*see* finding 26). Based on this record, the conduct of the parties and the contract terms, the site electrical distribution system was critical and therefore was not severable.

Appellant positively, definitely, unequivocally, and unconditionally refused to provide power unless it was paid more, above and beyond the amount agreed upon by the parties in Modification No. P00013, and this refusal amounted to a material breach of a non-severable contract requirement. We conclude that appellant anticipatorily repudiated the contract and the government was therefore justified in summarily terminating the contract for default.[11]

### 4. *Appellant's anticipatory repudiation was inexcusable*

The government having carried the burden of proving the propriety of the default termination, appellant must now show that its default was excusable. *See ADT*, 13 BCA ¶ 35,307 at 173,315. As discussed above, to do so appellant must demonstrate either that there exists some excusable cause for its default beyond its control and without its fault or negligence or that, as a result of a prior material breach by the government, appellant had a legal right of avoidance, thereby discharging its duty to perform and relieving it of the default termination. *See, e.g., McDonald*, 94-3 BCA ¶ 27,181 at 135,442; *Thomas S.*

---

[11] Because we find that the government was justified in terminating the contract for default because appellant anticipatorily repudiated the contract, we need not and do not consider the government's alternative arguments. *Cf. Cox & Palmer Constr. Corp.*, ASBCA Nos. 38739, 38746, 92-1 BCA ¶ 24,756 at 123,528.

34

*Rhoades*, ENG BCA No. 6025 *et al.*, 97-1 BCA ¶ 28,672. We consider each of appellant's arguments in turn.

### a. *The government did not materially breach by withholding progress payments*

Appellant argues that the government's failure to make progress payments was a material breach that excused appellant's further performance (app. br. at 44-50). As appellant states, a prior material breach by the government would discharge appellant's duty to perform and relieve appellant of the default termination and its consequences. *See Malone v. United States*, 849 F.2d 1441, 1445-46 (Fed. Cir. 1998); *see also Christopher Village, L.P. v. United States*, 360 F.3d 1319, 1334 (Fed. Cir. 2004) ("A later breach 'is justified…by the other party's [prior] failure.'") (quoting RESTATEMENT (SECOND) OF CONTRACTS § 237 cmt. b (1981)); *Stone Forest*, 973 F.2d at 1550 ("Upon material breach of a contract the non-breaching party has the right to discontinue performance of the contract, and to seek redress in accordance with law."). The government's failure to make progress payments when they are due is a classic example of such a prior breach. *See, e.g., Frank Pigeon v. United States*, 27 Ct. Cl. 167, 175-76 (1892) (government's wrongful withholding of 100% of two consecutive progress payments as an indemnity against the chance of possible failure on the part of the contractor was a material breach); *DWS*, 87-3 BCA ¶ 19,960 at 101,050 ("if the Government unjustifiably fails to pay amounts indisputably due and owing under the contract, the contractor may declare the Government to be in breach of contract and stop its performance."). Additionally, if appellant establishes that the CO breached the contract by wrongfully withholding progress payments, appellant must then demonstrate that the government's breach is material. *TRS Research*, ASBCA No. 51712, 01-1 BCA ¶ 31,149; *Consumers Oil*, 86-1 BCA ¶ 18,647 at 93,713-14.

In order to show that the government breached the contract by wrongfully withholding progress payments, appellant must first show that the progress payments were, in fact, due. *See, e.g., ADT*, 13 BCA ¶ 35,307 at 173,316-17; *Versar, Inc.*, ASBCA No. 56857 *et al.*, 12-1 BCA ¶ 35,025 at 172,126. There is no absolute right to progress payments. *Davis Group, Inc.*, ASBCA No. 48431, 95-2 BCA ¶ 27,702 at 138,092. Progress payments are authorized by statute, 10 U.S.C. § 2307, which requires that "any payment for work in progress (including materials, labor, and other items) under a defense contract that provides for such payments is commensurate with the work accomplished that meets standards established under the contract." 10 U.S.C. § 2307(e)(1); *see also Fortec Constructors*, ASBCA No. 27480, 83-2 BCA ¶ 16,727 at 83,186. The Payments clause for this contract (finding 7), therefore requires the contractor to substantiate and certify its requests for progress payments and payment under the clause "is subject to such things as contract compliance, substantiation of work done, and the CO's exercise of discretion in certain respects." *Versar*, 12-1 BCA ¶ 35,025 at 172,126.

35

A CO's discretion in deciding whether or not to withhold a progress payment is very broad. *U.S. Fid. & Guaranty Co. v. United States*, 676 F.2d 622, 630-31 (Ct. Cl. 1982). In addition to showing that it met all of the contractual conditions precedent to receiving a progress payment, appellant must also demonstrate that the CO abused his or her "considerable discretion" by withholding the payment. *TGC Contracting Corp. v. United States*, 736 F.2d 1512, 1515 (Fed. Cir. 1984) (appellant's burden to show that progress payments were erroneously withheld); *Carro & Carro Enterprises, Inc.*, ASBCA No. 59485, 15-1 BCA ¶ 35,915 at 175,572-73 (appellant's burden to show government failed to pay amounts due under the Payments clause for fixed-price construction); *ADT*, 13 BCA ¶ 35,307 at 173,316 (citing *Technocratica*, ASBCA No. 44347 *et al.*, 94-1 BCA ¶ 26,584 at 132,288). For example, the Schedules clause, FAR 52.236-15, gives the CO discretion to withhold approval of progress payments if the contractor fails to provide the CO with an acceptable work schedule within a specified time frame (finding 10). The Payments clause (finding 9), too, gives the CO considerable discretion in deciding whether payment is warranted given the amount of work completed and the quality of the work. *ADT*, 13 BCA ¶ 35,307 at 173,316 (withholding proper where contractor failed to adequately substantiate work performed); *see also Morganti Nat'l., Inc. v. United States*, 49 Fed. Cl. 110, 142 (2001), *aff'd*, 36 F. App'x 452 (Fed. Cir. 2002) (withholding proper under FAR 52.232-5(b) for deficiencies in work); *ONI Constr., Inc.*, ASBCA No. 45394 *et al.*, 96-2 BCA ¶ 28,277 at 141,184 (withholding proper where contractor made no progress in the time frame leading up to the unpaid invoice). Furthermore, where matters affecting progress payments are in dispute, the CO is entitled to give the government the benefit of the doubt in exercising his or her discretion. *Davis Grp.*, 95-2 BCA ¶ 27,702 at 138,093 (citing *Fortec*, 83-2 BCA ¶ 16,727).

Appellant has not established that it was actually due the payments which the government withheld. At the time the government decided to withhold Progress Payment Nos. 44 and 45, there was no approved schedule (findings 32, 34, 39, 45). Under such circumstances, the Schedules clause permits a CO to withhold a progress payment (finding 8). Although not required by the Payments clause, the government notified appellant on multiple occasions that its failure to provide the CO with an up-to-date and complete schedule could have an adverse effect on its receiving progress payments (findings 32, 34).

Additionally, the many and varied instances, over an extended period of time, in which subcontractors brought issues of non-payment to the government's attention provided ample justification to withhold progress payments until the issues were investigated and the matters resolved to the CO's satisfaction (*see* findings 20-22, 36, 42). We have previously upheld the CO's discretion to withhold progress payments when, despite a contractor's certification that payments to subcontractors had been made from previous progress payments, the CO received complaints of nonpayment from one, then several, subcontractors and suppliers. *See Dan F. Harrison Constr., Inc.*, ASBCA

No. 41572, 91-2 BCA ¶ 23,949 at 119,926 ("In light of [the contractor's certification regarding payments to subcontractors], it was reasonable for the [CO] to bring to appellant's attention and to investigate the subcontractor's nonpayment complaint prior to further processing of [the progress payment]."). We hold this to be such a case.

The government was justified in withholding progress payments after appellant repeatedly and consistently failed to provide a practicable schedule conforming to the requirements of the Schedules clause. Additionally, the government was justified in withholding progress payments in order to investigate the subcontractors' numerous and extended complaints of non-payment despite appellant's certifications to the contrary. We conclude that withholding Progress Payment Nos. 44 and 45 was a reasonable exercise of discretion, and thus the government did not breach by doing so.

b. *Appellant's anticipatory repudiation was not otherwise excusable*

Appellant contends that in the time between the parties' global settlement modifications (*see* findings 23-27) and the default termination (*see* finding 60), numerous events occurred that constituted "excusable delays" under the Default clause and the Other Changes in Contract Performance clause (app. br. at 50-57).[12] This, appellant argues, entitles appellant to 5.5 months excusable delay, which would extend the completion date for establishing permanent power from 1 March 2012 to 28 August 2012 and excuse the default (app. br. at 50-51, 55,).

Assuming, arguendo, that appellant proves entitlement to excusable delay, it would only entitle appellant to an extension of time; it would not excuse appellant's anticipatory repudiation. The government did not default appellant for failing to provide permanent power by 1 March, it invoked its common law remedy under the Default clause for anticipatorily repudiating its obligation under Modification No. P00013 to provide temporary power until a permanent power system was functioning (see finding 60). This repudiation was a material breach of the contract. Accordingly, in order to prove that its anticipatory repudiation was excused by one or more "excusable delays," appellant must show that such "excusable delays" entirely discharged its remaining duties. *B.F. Goodrich Co.*, ASBCA No. 19960, 76-2 BCA ¶ 12,105 at 58,157-58; RESTATEMENT (SECOND) OF CONTRACTS § 261 cmt. e ("[I]f the performance remains practicable and it is merely beyond the party's capacity to render it, he is ordinarily not discharged."). This requires appellant not only to prove the "excusable delay," but also to prove that it constituted the non-occurrence of a basic assumption of the contract and rendered performance impracticable. RESTATEMENT (SECOND) OF CONTRACTS § 261; *cf. A-Greater New Jersey Movers, Inc.*, ASBCA No. 54745, 06-1 BCA ¶ 33,179 at 164,433; *Howell Tool*, 96-1 BCA ¶ 28,225 at 140,941 (appellant's anticipatory

---

[12] Appellant refers to the Other Changes in Contract Performance clause (finding 3) as the "Combat" clause.

repudiation was not excusable "within the meaning of the Default clause" where appellant failed to prove financial inability to perform).

Appellant has not alleged, much less proven, that any of its asserted "excusable delays" constituted supervening circumstances that rendered performance impracticable and thus could have discharged its duty to provide power. Appellant argues that the cable for the site electrical distribution system was "not available," and that "[i]t was not possible to fly in the cable because the cost would have been in the millions of dollars" (app. br. at 25). However, appellant does not provide even rough calculations to support its conclusory "millions of dollars" assertion or explain why such an amount would render performance impracticable, nor does appellant address why it would have been impracticable, to bring the cable overland from any of the several other countries that share a border with Afghanistan. Argument is not proof. *Shubhada*, 08-1 BCA ¶ 33,733 at 167,019; *Harvex Trading Co.*, ASBCA No. 38279 *et al.*, 92-3 BCA ¶ 25,027 at 124,756.

Neither has appellant demonstrated the extremity of its resultant financial difficulties or established a causal link between any of its asserted "excusable delays" and its alleged inability to buy fuel or pay for generator maintenance. Both in writing and during his testimony, Mr. Reardon stressed that appellant was not insolvent during the time leading up to appellant's repudiation, but only that appellant needed additional funding from the government (finding 51). Appellant has not identified any evidence that appellant's financial situation during the time leading up to the default termination *was* dire, much less that it was dire as the result of any of its asserted "excusable delays." We are not required to scour the voluminous record, numbering as it does in the tens of thousands of pages, to discern if any proof might exist. *Webb Elec. Co. of Fla., Inc.*, ASBCA No. 54293, 07-2 BCA ¶ 33,717 at 166,947. "It is well-established that the contractor assumes the risk of providing resources sufficient to perform a contract. Undercapitalization will not excuse a failure to perform." *Rhoades*, 97-1 BCA ¶ 28,672 at 143,232 (citing *Willems Indus., Inc. v. United States*, 295 F.2d 822 (Ct. Cl. 1961), *cert. denied*, 370 U.S. 903 (1962)); *see also Cosmic Constr. Co.*, ASBCA Nos. 24014, 24036, 88-2 BCA ¶ 20,623. When it signed Modification No. P00013, appellant agreed to assume the costs of fueling and maintaining the generators that provided temporary power to the ANA barracks until such time as it connected the CSB power system to the Camp Hero power plant if it had not yet done so by 1 March 2012 (finding 27). Appellant failed to connect the CSB power system to the power plant, and on 1 March 2012 the government stopped paying for fuel to run the generators. From that point on, it was solely appellant's obligation to fuel and maintain the generators until the CSB was connected to the power plant. By agreeing to Modification No. P00013, appellant assumed the risk of paying for generator fuel and maintenance after 1 March 2012.

Likewise, appellant cannot attribute its financial difficulties to any fault on the part of the government. The government's failure or delay to make payments can constitute a defense to a default termination only if they rendered the contractor financially incapable of continuing performance; are the primary or controlling cause of appellant's default; or are a material, rather than insubstantial or immaterial, breach of the contract. *Jones Oil*, 98-1 BCA ¶ 29,691 at 147,151; *Consumers Oil*, 86-1 BCA ¶ 16,647 at 93,710. We have already held the government's withholding of progress payments was justified and thus did not constitute a breach, and appellant has not demonstrated that it *was* financially incapable of performing the contract. While the government's withholding of the two progress payments might have exacerbated appellant's financial difficulties, appellant has not shown that it was the primary or controlling cause. Indeed, to the extent that appellant was having trouble paying its subcontractors and suppliers, it appears from the record that such difficulties may have begun as early as 1 February 2011 (finding 20), long before the government ever withheld a progress payment. Thus, appellant has given us no reason to depart from the normal rule that the contractor's financial difficulties are not a legitimate excuse for its default. *See, e.g., Danzig v. AEC Corp.*, 224 F.3d 1333, 1339 (Fed. Cir. 2000); *TGC*, 736 F.2d at 1515 (withholding of progress payments is no excuse when the contractor's failure to perform was "the direct result of its lack of working capital, its negligence, and its own actions").

Appellant has failed to carry its burden of proving that its repudiation was excused within the meaning of the Default clause. We conclude that none of the "excusable delays" alleged by appellant discharged its obligation to provide power, nor did they render appellant's obligation impracticable; accordingly, they cannot excuse appellant's anticipatory repudiation.

## B. The Government Did Not Waive Its Right to Terminate for Default

Appellant also contends that, given the parties' 1 March 2012 performance deadline, the government waived its right to terminate for default by waiting until 23 April 2012 to terminate the contract (app. br. at 58-59). Invoking the waiver doctrine from *DeVito v. United States*, 413 F.2d 1147 (Ct. Cl. 1969), appellant argues that the government did not exercise its right to terminate in a reasonable time and that appellant relied to its detriment upon the government's forbearance by continuing with the contract (app. br. at 58-59). We note that there are significant differences between construction contracts and other contracts when it comes to the doctrine of waiver in the context of the government's right to terminate a contract for default. *See MIC/CCS*, 14-1 BCA ¶ 35,612 at 174,435 (noting that "the *DeVito* 'waiver' doctrine (sometimes referred to as an estoppel issue) normally does not apply to construction contracts absent unusual circumstances."). Setting those differences aside, however, it is obvious that the *DeVito* waiver doctrine is inapplicable to these facts. Appellant anticipatorily repudiated the contract on 22 April 2012, and for that its contract was immediately terminated. It is

immaterial that the deadline for performance had passed over a month previously without either termination or the establishment of a new schedule. Appellant's anticipatory repudiation gave the CO an independent right to terminate the contract for default. *B.F. Goodrich*, 76-2 BCA ¶ 12,105 at 58,158; *see also MIC/CCS*, 14-1 BCA ¶ 35,612 at 174,435 ("even if the government has waived a contract completion date, it may still terminate a contract for default if the contractor...materially breaches other contract obligations"). The *DeVito* waiver doctrine is inapposite where, as here, the government exercised its right to summarily terminate the contract pursuant to a contractor's anticipatory repudiation.

Under certain circumstances, the government might nevertheless waive its right to terminate on the basis of a contractor's anticipatory repudiation; however, appellant has not shown that such circumstances exist in this case.[13] The government does not waive its right to terminate a contract for default following a contractor's repudiation simply by urging the contractor to continue performing. *Cf. Mobil Oil Exploration and Producing Southeast, Inc. v. United* States, 530 U.S. 604, 621-22 (2000); *see also Amber Resources Co. v. United States*, 538 F.3d 1358, 1376 (Fed. Cir. 2008); *Consumers Oil*, 86-1 BCA ¶ 18,647 at 93,708 n.14; RESTATEMENT (SECOND) § 257 ("The injured party does not change the effect of a repudiation by urging the repudiator to perform in spite of his repudiation or to retract his repudiation."). During the short time between appellant's repudiation and the termination of the contract, the government merely urged appellant's continued performance. After appellant continued to refuse to provide power without receiving additional payment, the CO finally terminated the contract for default. Accordingly, we conclude that the government did not waive its right to terminate the contract for appellant's anticipatory repudiation.

## C. The Default Termination was Neither Procedurally Inadequate nor an Abuse of Discretion

Turning now to appellant's final defense, we conclude that appellant has failed to show that the default termination was procedurally inadequate or an abuse of discretion. The Default clause (finding 7) requires neither a cure notice nor a show-cause letter prior to terminating a construction contract for default. *ONI*, 96-2 BCA ¶ 28,277 at 141,180. Even so, a pre-termination cure notice would have been unnecessary in this case given appellant's anticipatory repudiation. *See, e.g., Polyurethane Prods. Corp.*, ASBCA No. 42251, 96-1

---

[13] Although it does not, strictly speaking, bear on the question of waiver, we note that appellant never retracted its repudiation. *See Mobil Oil*, 530 U.S. at 621; RESTATEMENT (SECOND) OF CONTRACTS § 256 ("The effect of a statement as constituting a repudiation...is nullified by a retraction of the statement if notification of the retraction comes to the attention of the injured party before he materially changes his position in reliance on the repudiation or indicates to the other party that he considers the repudiation to be final.").

BCA ¶ 28,154 at 140,545 (cure notice requirement "dispensed with" by contractor's anticipatory repudiation); *Mission Valve & Pump*, 69-2 BCA ¶ 8010 at 37,243 (CO is not required to go through "useless motions").

Nonetheless, the Default clause does not mandate termination; it merely gives the CO the discretion to terminate for default. *U.S. Coating Specialties & Supplies, LLC*, ASBCA No. 58245, 15-1 BCA ¶ 35,957 at 175,708 (citing *Radar Devices, Inc.*, ASBCA No. 43912, 99-1 BCA ¶ 30,223 at 149,528). Such discretion must be reasonably exercised, even after a contractor anticipatorily repudiates a contract. *McDonald*, 94-3 BCA ¶ 27,181 at 135,450 (citing *Darwin Constr. Co. v. United States*, 811 F.2d 593, 596-97 (Fed. Cir. 1987)); *A-Greater*, 06-1 BCA ¶ 33,179 at 164,432-33. The factors set forth in FAR 49.402-3(f) alert the CO to areas of concern to possibly consider; however, the CO's consideration of the FAR factors is merely one element to be considered in evaluating the totality of the circumstances involved in the situation. *Michigan Joint Sealing, Inc.*, ASBCA No. 41477, 93-3 BCA ¶ 26,011 at 129,323-24. While consideration of the FAR factors may aid in determining whether there has been an abuse of discretion in the decision to terminate, the regulation does not confer any rights on the defaulting contractor, *All-State Constr.*, 06-2 BCA ¶ 33,344 at 165,342, and failure to consider one or more of the factors would not require a default termination to be converted into a termination for convenience, *DCX, Inc. v. Perry*, 79 F.3d 132, 135 (Fed. Cir. 1996). "In determining whether there has been an abuse of discretion, we examine whether there was subjective bad faith; whether there was a reasonable basis for the decision; the degree of discretion reposed in the CO; and whether applicable regulations and laws have been observed." *Shubhada*, 08-1 BCA ¶ 33,733 at 167,019 (citing *F&L Packing Corp.*, ASBCA No. 42362, 93-1 BCA ¶ 25,305 at 126,063). The burden of proof is appellant's. *American Renovation & Constr. Co.*, ASBCA Nos. 53723, 54038, 09-2 BCA ¶ 34,199 at 169,061.

Here, appellant challenges only the CO's rationale for terminating the contract and the extent to which she complied procedurally with regulations. In particular, appellant challenges the CO's failure to consider potential "excusable delays" (app. br. at 60-61). However, the record clearly shows that the CO gave due consideration to appellant's alleged excusable delays and adequately documented her rationale in the termination decision: "[Highland] has given the Government many excuses as to why the permanent power was not in place as of March 1, 2012. Irrespective of any excuse [Highland] had a contractual obligation to provide temporary power and [Highland] stopped providing temporary power.... [Highland's] failure to provide temporary power to the CSB site is a breach of [Highland's] contractual duties." (Finding 60) In alleging its excuses, appellant did not show how any of them had impacted work on the critical path or even how long any of the alleged excuses lasted. Moreover, to excuse appellant's repudiation, appellant would need to have at least alleged the existence of some supervening event that discharged its performance obligations, and did not do so. We hold that the CO's analysis of appellant's alleged excuses was appropriately detailed given the level of specificity with which appellant alleged them. *Cf. A-Greater*, 06-1 BCA ¶ 33,179 at

41

164,433; *Jones Oil*, 98-1 BCA ¶ 29,691 at 147,150-51. Moreover, the record indicates that the parties had long recognized an "urgent need" to provide temporary power to the CSB (findings 19, 27, 33), and that based on recent past experience both the CO and appellant's own project manager feared that an extended interruption to the power would result in rioting and havoc among the Afghan soldiers living in the barracks (findings 51, 54). The record shows that the "urgency of the need" for continued temporary power was at the forefront of the CO's consideration. *See* FAR 49.402-3(f). Given appellant's refusal to perform and the availability of other contractors who could provide temporary power, we have no basis to conclude that the CO acted arbitrarily or capriciously in determining that terminating the contract was in the government's best interest. *Cf. David R. Levin, Tr. in Bankr. for Rosedale Dairy Co.*, ASBCA No. 5077, 59-1 BCA ¶ 2061 at 8,705 (prompt termination "fully justifie[d]" by the urgent need for milk to be supplied on a daily basis). Appellant has thus failed to carry its burden of proving the CO abused her discretion. In light of appellant's anticipatory repudiation and the perceived threat of grievous harm to health and security posed thereby, we conclude that the CO followed procedural requirements and her decision to terminate the contract for default was not an abuse of discretion.

## CONCLUSION

The government has shown that appellant anticipatorily repudiated its obligation to provide temporary power to the ANA barracks, justifying the termination of the contract for default. Appellant has failed to show that its repudiation was excused by a prior material breach by the government, that its contractual duties were discharged by supervening circumstances, that the government waived its right to terminate or that the default termination was either procedurally inadequate or an abuse of discretion. Therefore, the appeal is denied.

Dated: 30 March 2016

JOHN J. THRASHER
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

42

I concur

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58243, Appeal of Highland Al Hujaz Co., Ltd., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals